UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
TOTALMAR NAVIGATION CORP.            :
                                     :
             Plaintiff,              :     08cv1659 (HB)
                                     :     **OPINION & ORDER**
      -against-                      :
                                     :
ATN INDUSTRIES, INC.,                :
                                     :
             Defendants.             :
------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

Defendant ATN Industries, Inc. ("ATN") moves to vacate or reduce this Court's February 19, 2008 Ex Parte Order of Maritime Attachment (the "Attachment") that attached its assets in New York in the amount of $1,713,819.60 to secure the dead freight and demurrage claims of Plaintiff Totalmar Navigation Corp. ("Totalmar"). ATN further moves for countersecurity for its counterclaims for in-transit damage to its cargo. Each party also moves to compel the other to submit to arbitration. For the reasons stated below, ATN's motion to vacate the attachment is denied, and its motion to reduce the attachment is granted in part and denied in part. ATN's motion for countersecurity is denied. Finally, the parties have agreed to let the M.V. Skala arbitration panel decide the issue of consolidation for the M.V. Skala, M.V. Rainbow, M.V. Majartta, and M.V. Go Star claims. The Court separately orders the parties to submit the M.V. Atlantica claim for arbitration in London.

## I. BACKGROUND

### A. Contracts for the Shipping of Industrial Water Pipes

In November and December 2007, Defendant ATN chartered five ships from Totalmar to transport industrial water pipes from Shanghai, China to Maracaibo, Venezuela. Totalmar does not own the ships; it is a disponent owner. The charter agreements for each of the vessels—M.V. Skala, M.V. Rainbow, M.V. Majartta, M.V. Go Star, and M.V. Atlantica—contained arbitration clauses.[1]

---

[1] The M.V. Skala, M.V. Rainbow, and M.V. Majartta charters provide for New York arbitration. The M.V. Go Star charter provides for London arbitration. The M.V. Atlantica charter provides for London arbitration and also specifies English law. None of the other charters specify governing law.

- 1 -

**B. Totalmar's Dead Freight Claims**

Each charter agreement specifies the dimensions and minimum number of pipes to be shipped. The minimums are intended to guarantee the actual ship owners a certain amount of cargo. A claim for dead freight lies when these minimums are not reached. Totalmar brings claims for dead freight under only the M.V. Skala and M.V. Go Star charters.

In the case of M.V. Skala, the original charter agreement dated November 23, 2007 (the "Skala Charter") called for "Min 480 to 500 pices of pipes upto vessel's maximu capacity at Owners option of water pipes of policarbonate steel pipes dimensions Guarantee by Charterers. See also clause 22 [sic]." Compl. Ex. 1. Clause 22 restates the minimum number of pipes and specifies that the pipes shall have an outer diameter of 2.6 meters and a length of 12.192 meters. *Id.* Totalmar alleges that the Captain of M.V. Skala (the "Master") sent ATN a letter of protest on December 8, 2007 stating that the ship would be able to carry 490 pipes, but that ATN only supplied 430 pipes. *Id.* at ¶ 7, Ex. 2. The Skala Charter was modified by a signed addendum dated December 30, 2007 (the "Skala Addendum"), which provides in pertinent part:

> …due to regulations and restrictions on the visibility for cargoes loaded on deck; the M.V. Skala will only be able to load min 410 pipes instead of the minimum 480 pieces contracted for as shown on Charter party dated 23/11/07 signed by the two parties, so as to comply with said regulations and visibility restrictions. The Master will do the utmost to load more considering restrictions at Panama Canal and the safety and stability of the vessel.

*Id.* at Ex. 1. ATN argues that Totalmar improperly ignored the clear import of the Skala Addendum in its Complaint and that the Skala Addendum invalidates Totalmar's dead freight claim as a matter of law. Def.'s Mem. at 5; Hrg. Tr. 7:25; 8:1-11. Totalmar argues that the M.V. Skala dead freight claim is based on the Master's obligation "to do the utmost to load more" and that the Master had already informed ATN that the M.V. Skala could safely load 490 pipes. Pl.'s Mem. at 11.

Totalmar's dead freight claim relative to the M.V. Go Star is based on an alleged shortage in the cubic volume of the cargo, as opposed to a shortage in the number pipes carried.[2] Compl. ¶¶ 23-25. The original charter dated December 7, 2007 required a minimum of "435 pieces of pipes upto vessel's full capacity at Owners option of policarbonate steel water pipes dimensions guarantee by Charterers. See also clause 22 [sic]." *Id.* at Ex. 8. Clause 22 in the

---

[2] M.V. Go Star was a substitute for M.V. Mairouli and thus the M.V. Mirouli charter dated December 7, 2007 governs. (Compl. ¶ 23.)

governing charter restates the 435-pipe minimum and lists the same pipe dimensions specified in the Skala Charter. *Id.* The agreement was modified by an addendum dated December 28, 2007, which provides: "…vessel will only load min 410 pieces of pipes upto [sic] vessel's full capacity in Charter option." *Id.* ATN loaded 431 pipes onto the M.V. Go Star, but Totalmar alleges that 400 of those pipes had an outside diameter of only 2.40 meters—0.2 meters less than the agreement required. ATN claims that it notified Totalmar that the pipe supplier in Shanghai only had pipes of a smaller diameter and that Totalmar did not object even though a reduction in the diameter of the pipes reduced the overall cargo volume which, as a disponent owner, Totalmar sought to maximize. *See* Gonzalez De La Vega Decl., Ex. C. ATN also contends that the December 28, 2007 addendum to the charter effectively deleted ATN's dimensional guaranty. Hrg. Tr. 14: 14-18. Totalmar disputes that the addendum had such an effect. Pl.'s Mem. at 11.

## C. Totalmar's Demurrage Claims

The demurrage actions come under the M.V. Rainbow, M.V. Go Star, and M.V. Atlantica charters. Clause 27 of each charter provides for demurrage charges to ATN in the case of extended ship use "after laytime expires at loadport or discharge port." Compl. Ex. 4, 6, 8. Clause 26 specifies that "Total laytime for loading [is] 4 weather working days Sundays and holidays included." *Id.* Penalties for exceeding laytime amount to liquidated damages and are set by clause 27 of the respective charters.[3] Totalmar seeks a total of $381,220.00 in demurrage claims for the three vessels.[4]

## D. ATN's Cargo Damage Counterclaims

ATN's counterclaim, filed June 25, 2008, alleges damage to pipes spread across all five ships. In total, 92 pipes were allegedly replaced at a cost of $1,719,517. Countercl. ¶¶ 11-44.

---

[3] Demurrage and detention damages under the M.V. Atlantica charter are ambiguous. Clause 27 provides first that waiting time "after laytime expires at loadport or discharge port will count as demurrage and will be paid by charterers at the rate of USD 70,000 per day pro rata for part of the day." Clause 27 subsequently provides that "Detention at discharge port to be paid at the rate of US $60,000 per day prorata." Finally, Clause 42 provides "demm usd 60.00 pdpr." Page 1 of the charter, however, specifically refers to clause 27 as governing for demurrage purposes.

[4] Specifically, Totalmar alleges that the M.V. Atlantica arrived in Shanghai at 7:00 A.M. on December 10, 2007, completed loading at 12:30 P.M. on December 15, 2007, and left for Maracaibo at 4:10 P.M. that same day. (Compl. ¶ 13.) Totalmar claims that the loading period exceeded the laytime of four working days by 1.229 days for a demurrage charge of $86,030.00. (Compl. ¶ 14.) Totalmar alleges that the M.V. Rainbow arrived in Shanghai at 8:12 A.M. on December 16, 2007, completed loading at 11:00 A.M. on December 22, 2007, and left for Maracaibo at 10:24 P.M. that same day. (Compl. ¶ 19.) Totalmar claims that the loading period exceeded the laytime by 2.113 days for a charge of $147,910.00. (Compl. ¶ 20.) The M.V. Go Star arrived in Shanghai at 10:00 AM on January 20, 2008, completed loading at 12:00 PM on January 26, 2008 (Compl. ¶ 25.) Totalmar claims that the loading period exceeded the laytime of four days working days by 2.104 days for a demurrage charge of $147,280. (Compl. ¶ 26.)

The charter agreements allocate responsibility for cargo damage between the Charterers (ATN) and the Owners (Totalmar).[5] Clause 2 of the agreements, titled "Owner's Responsibility Clause," provides that Owners are responsible for:

> loss of or damage to the goods…caused by improper or negligent stowage of the goods (unless stowage performed by shippers, Charterers or the stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped, and supplied or by the personal act or default of the Owners or their Manager.  And the Owners are responsible for no loss, damage or for delay arising from any other cause whatsoever, even from the neglect or default of the Captain or Crew.

Countercl. Exs. 1, 3, 5, 7, 9.  Clause 33 of the charter agreements provides that "Charterers are to load cargo on board vessel free of expense to vessel . . . such operation to be done by shore labour . . . and to be always to Masters [sic] approval / direction / satisfaction."

Totalmar claims that because ATN was responsible for loading the pipes it is responsible for any damage due to improper stowage.  Pl.'s Mem. at 18.  The Totalmar further claims that because bills of lading reflected damages to the pipes at the loading port in Shanghai, ATN was on notice of pre-shipment damage but failed to inspect the cargo when it was offloaded in Maracaibo.  *Id.*  Moreover, Totalmar contends that after reaching Maracaibo, the pipes were transported by ATN to a site 112 miles away and ATN waited approximately four months after the first shipment of pipes arrived in Maracaibo before it notified Totalmar of the alleged damage.  Hernandez Decl. ¶¶ 10, 12. ATN disputes each of these contentions and argues that its Counterclain does not cover pipes damaged prior to shipment.  Def.'s Reply Mem. 8-9 (citing Gonzalez De La Vega Decl. ¶¶ 10-12.)

## II. DISCUSSION

### A. Defendant ATN's and Plaintiff Totalmar's Motions to Compel Arbitration

In the midst of briefing, the parties agreed to have the M.V. Skala panel in New York decide the consolidation issue with respect to those arbitrations that have already commenced: i.e. the arbitrations for the M.V. Skala, M.V. Rainbow, M.V. Majartta, and M.V. Go Star. However, at oral argument ATN did not agree to include the M.V. Atlantica dispute with the others because at that time Totalmar had not yet initiated arbitration with respect to that vessel.

---

[5] Even though Totalmar does not actually own the ships, each charter expressly classifies them as "Owners" for the purposes of contract.

- 4 -

Consequently, the Court separately orders the parties to submit the M.V. Atlantica claim to arbitration in London.

**B. Defendant ATN's Motion to Vacate the Attachment**

ATN argues for complete vacatur of the Attachment because (1) Totalmar allegedly failed to file an affidavit averring that ATN could not be found in this district as required by Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure ("Rule B"); (2) Totalmar failed to state *prima facie* dead freight claim**s** because Totalmar's allegations are in direct conflict with language in the addenda to the charters that ATN contends reduced the minimum cargo requirements and are fatal to Totalmar's claims; and (3) Totalmar abused the ex parte maritime attachment proceeding by seeking the Attachment based on claims that, from the face of the Complaint, have no merit. ATN does not dispute that Totalmar has stated a *prima facie* claim for demurrage with respect to the M.V. Rainbow, M.V. Skala, and M.V. Atlantica, but ATN does contend that the Attachment is based on an overstated daily rate for demurrage damages.

**1. Legal Standard**

The Second Circuit has made clear that a maritime attachment should be issued if a plaintiff satisfies the filing and service requirements of Rule B and Rule E of the Supplemental Admiralty Rules, and shows that: (1) it has a valid *prima facie* admiralty claim; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006). To oppose a motion for vacatur under Rule E(4)(f), the plaintiff has the burden to show that an attachment was properly ordered and that it complied with the requirements of Rules B and E. *Id.* However, once a plaintiff has met the four requirements articulated above, an attachment is normally upheld absent certain specific exceptions not at issue here.[6] As *Aqua Stoli* made clear, district courts have limited equitable discretion to vacate maritime attachments that otherwise comply with Rule B. *See Stolt Tankers B.V. v. Geonet Ethanol, LLC*, 08cv4382 (SAS), 2008 WL 4829944 (S.D.N.Y. 2008).

---

[6] In *Aqua Stoli,* the Second Circuit detailed the "other limited circumstances" when vacatur is appropriate: "We believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam jurisdiction* over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." *Aqua Stoli,* 460 F.3d at 445.

The courts of this district have consistently found that when they are required to determine if a plaintiff has asserted a "valid *prima facie* admiralty claim" in ruling on a motion for vacatur the district court should not conduct a full-fledged inquiry into the merits of the plaintiff's claim. Indeed, "a detailed discussion of the merits . . . has little bearing on the motion to vacate, which is decided based on whether a *prima facie* claim is shown and technical requirements for attachment have been met." *Chiquita Int'l Ltd. V.M. v. Bosse,* 518 F. Supp.589, 599 (S.D.N.Y. 2007). In *Tide Line, Inc. v. Eastrade Commodities*, 06cv1979 (KMW), 2006 WL 59297 (S.D.N.Y. 2006), Chief Judge Wood found that *Aqua Stoli* implicitly undermined the idea that a Rule E hearing is intended to "make a preliminary determination whether there were reasonable grounds for issuing the warrant."

The directives from the Circuit are less clear with respect to the limits on what matters the Court may consider to determine whether a *prima facie* claim has been stated. Although the courts of this district have generally interpreted *Aqua Stoli* to limit that inquiry (*see e.g. Tide Line,* 2006 WL 59297 (noting that under the logic of *Aqua Stoli*, "the Court should not engage in a broad inquiry into evidence presented…")), the Circuit's more recent decision in *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, (2d Cir. 2008), opines that a district court may properly look beyond the pleadings when considering a motion for vacatur under Rule E(4)(f). *See also*, *SPL Shipping Ltd. V. Gujarat Chiminex Ltd.*, 06cv15375 (RJS), 2008 WL 4900770 (finding that *Williamson* "stand[s] for the proposition that a district court does not abuse its discretion when it considers evidence outside of the pleadings on motion to vacate an order of attachment."). Thus, while the Court's inquiry on a motion for vacatur is generally limited to whether a *prima facie* admiralty claim has been stated, I may look beyond the four corners of the pleadings to make such a determination.

**2. Affidavit Averring ATN Was Not in the District**

Defendant ATN argues that Plaintiff failed to satisfy the Rule B requirement that requires an affidavit averring that the Defendant cannot be found in the district. Plaintiff appears to have filed the required affidavit with the verified complaint, but it was not uploaded onto the Southern District's Electronic Document Filing System (ECF) at that time.[7] From research into past cases, the Clerk of this district does not always upload the affidavit onto ECF concurrently with

---

[7] Plaintiff's counsel provided the Court with his copy of his Attorney Affidavit, notarized and dated February 19, 2008, which is the date of the Complaint.

the Complaint. Defendant's argument appears to rely solely on the fact that the affidavit was posted on ECF later than its notarized date and the Court must decline to vacate the Attachment on such grounds.

### 3. Vacatur of Dead Freight Claims

Totalmar's two dead freight claims state valid causes of action. First, although ATN argues the Skala Addendum defeats the M.V. Skala claim, Totalmar contends that the Master's obligation "to do the utmost to load more" pursuant to the Skala Addendum should be read in conjunction with his earlier statement that the M.V. Skala could safely load 490 pipes. Pl.'s Mem. at 11. It is not for this Court to reach the merits of that argument. *Chiquita Int'l,* 518 F. Supp. 2d at 599. The Declaration of Vincente Gonzalez De La Vega submitted by ATN highlights the parties' conflicting contentions with regard to the M.V. Skala Charter but does not demonstrate that Totalmar has failed to state a *prima facie* admiralty claim.

Second, Totalmar's M.V. Go Star dead freight claim is based on a shortage in the total cubic volume of the cargo, and it is not clear that the applicable charter addendum deleted the dimensional guaranty as ATN argues. The import of the charter addendum is a matter of contract interpretation that must be resolved by the arbitral panel. Totalmar's allegations are sufficient to state a *prima facie* case to satisfy the Rule B pleading standards. Moreover, Totalmar properly averred that ATN cannot be found within the district, ATN's property has been found within the district, and there is no statutory or maritime law bar to Totalmar's claims. Consequently, ATN's motion to vacate the Attachment is denied. *See Aqua Stoli,* 460 F.3d at 445.

## C. Defendant ATN's Motion to Reduce the Attachment

In the absence of a complete vacatur, ATN asks the Court to use its discretion to reduce the Attachment because the allegations in Totalmar's Complaint are flatly contradicted by terms of the charter party addenda attached thereto. ATN seeks a reduction for (1) the full amount of the dead freight claims, (2) a reduction in the per-day rate for the demurrage claims, and (3) corresponding decreases in the sums attached for interest.

### 1. Legal Standard

Under Rule E(6), "[w]henever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given; and if the surety shall be or become

insufficient, new or additional sureties may be required on motion and hearing." Fed. R. Civ. P. Supp. Rule E(6); s*ee also*, *Greenwich Marine, Inc. v. S.S. ALEXANDRA*, 339 F.2d 901, 905 (2d Cir. 1965) (noting that district courts have the power to adapt an admiralty rule to the equities of a situation).  The Court also has authority to vacate or reduce an attachment "upon a showing of improper practice or a manifest want of equity on the part of the plaintiff."  *Chiquita Int'l.* 518 F.Supp.2d at 597; *see also, Proshipline, Inc. v. Aspen Infrastructures Ltd.*, 533 F.Supp.2d 422, 429 (S.D.N.Y. 2008).  For example, in *Sea Transport Contractors. v. Industries Chemiques du Senegal*, 411 F.Supp.2d 386, 396 (S.D.N.Y. 2006), an attachment was reduced because the plaintiff's allegations in its complaint relative to the term of the contract contradicted the contract's plain language.

### 2. Reduction Is Appropriate

ATN argues that the addenda to the Skala and Go Star charters reduced the minimum pipe requirement, that the pipes supplied by ATN met those minimums, and that therefore Totalmar's dead freight claims are meritless.  In its defense, Totalmar raises the arguments discussed *supra* in Section II.B.3.

Counsel for parties seeking ex parte relief must be particularly attentive to their role as an "officer of the court." *Great Eastern Shipping Co. Ltd. v. Phoenix Shipping Corp.* 2007 WL 4258238, *3 (S.D.N.Y. 2007) (quoting *Mallard v. U.S. Dist. Ct. for the So. Dist. of Iowa,* 490 U.S. 296, 313 n. 4 (1989).  Consequently, the Court is skeptical of the wholesale omission in Totalmar's Complaint of any reference to the Skala Addendum that, on its face, substantially undermines Totalmar's dead freight claims with respect to that vessel.  Because Totalmar has an argument—albeit a strained one—as to why the Skala Addendum does not defeat their dead freight claim, the better practice would have been to state a *prima facie* dead freight claim, reference the Addendum in the Complaint, and explain why it did not apply.  But Totalmar's all-too-convenient omission appears to belie matters adverse to its claim. Equity ought not to reward such conduct, and consequently Totalmar's attachment must be reduced by $657,329.52, the amount of the M.V. Skala dead freight claim together with a corresponding amount of the attached interest.

Totalmar asserts a more plausible argument with respect to the M.V. Go Star dead freight claim, arguing that it is unaffected by the applicable charter addendum.  Consequently Totalmar's failure to expressly reference the addendum in its Complaint is less egregious.

Accordingly, the attachment will not be reduced by the amount of the M.V. Go Star dead freight claim

Finally, the foregoing does not affect that portion of the Attachment that secures the demurrage claims. Totalmar correctly quotes the $70,000 per day demurrage rate; this is not a detention case. For the foregoing reasons, the Attachment of $1,713,819.60 is hereby reduced by $657,329.52 to $1,056,490.08.

## D. Defendant ATN's Motion for Countersecurity

Defendant ATN seeks countersecurity for its counterclaim of in-transit damages to certain of its pipes in the amount of $1,719,517. Totalmar argues that ATN is attempting to game the system with a frivolous counterclaim and motion for countersecurity. They also submit that countersecurity would be too burdensome because the company has extremely limited financial resources.

### 1. Legal Standard

Rule E(7)(a) provides that: "[w]hen a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court, for cause, shown, directs otherwise." Fed. R. Civ. P. Supp. Rule E(7)(a).

This Court possesses broad discretion in deciding whether to exercise its equitable powers to order countersecurity. *Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc*., 56 F.3d 394, 399 (2nd Cir. 1995); *North Offshore AS v. Rolv Berg Drive AS*, 2007 WL 4233014, at *3 (S.D.N.Y. Nov. 29, 2007). In deciding whether countersecurity should be ordered, two major principles govern: (1) parties should be placed on an equal footing with respect to security; and (2) Rule E(7) is not meant to be so burdensome so as to prevent the bringing of the suit. *Result Shipping Co.* 56 F.3d at 399.

### 2. Countersecurity Should Not Be Granted

The Court here exercises its discretion to avoid the imposition of an undue burden on Plaintiff that could prevent resolution of the underlying claims. In this case, we have two parties with vastly disparate financial capabilities. ATN had the ability to pay $20,000,000 to ship their pipes, and Totalmar only collected a small portion of that amount as a middleman. Hrg. Tr. 33: 2-8. Plaintiff has represented to this Court that it has only one office with five employees, assets

of only $36,787.17, and a 2007 "adjusted profit" of $180,000. Hernandez Decl. ¶¶ 13-18, Ex. 15. Forcing Totalmar to post countersecurity could effectively prevent it from operating as well as impair continued prosecution of its claims against ATN. This Court does not opine on the merits of ATN's counterclaims, but rather, in exercising its equitable discretion, notes the comparative financial standing of the parties and ATN's delay in notifying Totalmar of the alleged damage to its cargo. This Court will not stand by and allow ATN to game the system in the name of equity. Therefore, ATN's motion for countersecurity is denied.

### III. CONCLUSION

For the foregoing reasons, Defendant ATN's motion to vacate the Attachment is denied and its motion to reduce the Attachment is granted in part; the Attachment is reduced as set forth above. The parties are directed to submit an amended Ex Parte Attachment Order that reflects the foregoing reduction within ten days from the date hereof. Furthermore, ATN's motion for countersecurity is denied. The parties are ordered to submit the M.V. Atlantica claim to arbitration in London and include in the amended order that the M.V. Atlantica claim has been submitted to the appropriate arbitration panel.

**IT IS SO ORDERED.**
New York, New York
December 12, 2008

_____
U.S.D.J.